**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HERBERT BOYNTON,<br><br>        **Plaintiff,**<br><br>-against-<br><br>CABLEVISION LIGHTPATH, LLC,<br><br>        **Defendant.** | **Case No. 26 Civ. 2252 (ARL)** |

**FIRST AMENDED COMPLAINT**

Plaintiff Herbert Boynton, by and through his attorneys, Smith Mullin, P.C. and Kessler Matura, P.C., complaining of Cablevision Lightpath, LLC ("Lightpath" and "Defendant"), alleges as follows:

**INTRODUCTION**

1. At Lightpath, being older put a target on your back. Refusing to stay silent sealed your fate.

2. Discrimination at Lightpath did not occur in isolation. It originated at the top and was strategic. Beginning in or about 2022, CEO Chris Morley set his sights on expanding Lightpath into AI infrastructure and data center development, a move that would take the company beyond its traditional fiber infrastructure business model. Morley discriminatorily concluded that the transformation required a younger workforce. He backed that discriminatory belief with an age-based analysis of the company, repeated comments disparaging older employees—including statements that the company needed to "go young" and "get rid of the old people"—and a systematic effort to push out the experienced telecommunications executives who had built the business.

3. Herbert Boynton was one of those executives. A senior leader with forty years in telecommunications, Boynton joined Lightpath in 2021. He quickly became indispensable, rebuilding operations from the ground up, generating over $1 million in annual savings, driving positive net installations, and achieving significant EBITDA growth. Morley himself called the results "extraordinary." At Lightpath, however, age trumped performance.

4. In August 2023, Morley asked Boynton to step aside to a lesser role so that younger employees—whom Morley described as "young and rising leaders"—could advance in his place. To secure Boynton's cooperation, and because the business still needed Boynton, Morley made deliberate promises: equity in the company worth millions, a guaranteed "seat at the table," and assurances that Boynton would "always have a job" at Lightpath. But these promises were not made in good faith. These promises were made to secure Boynton's cooperation and continued excellent performance while Morley planned to eventually remove him from the company.

5. The erosion was gradual but unmistakable. Over the following two years, Morley stripped Boynton of responsibilities, reduced his compensation without explanation, excluded him from board meetings, and denied him the leadership role he had held and been led to expect. All the while, Boynton continued to deliver results, meeting and exceeding sales targets, managing five departments, and handling executive escalations. Morley's own acknowledgment at the time of termination said it plainly: Boynton had "done a great job" and "done nothing wrong."

6. The age-driven agenda did not stop with sidelining Boynton. In January 2025, Lightpath hired a new President, Joseph Harding, with no experience in operations or sales. Harding extended the hostile environment beyond age with a pattern of inappropriate and offensive sexually charged comments and behavior that permeated the workplace. Boynton reported

Harding's conduct to his supervisor, but Lightpath did nothing. Instead, the company coupled age discrimination with retaliation against Boynton for complaining about a hostile work environment.

7.    In August 2025, Lightpath terminated Boynton and stripped him of earned equity in the process. The decision came despite his performance, his contributions, and Morley's repeated promises that there would always be a place for him at the company. The termination was driven by Boynton's age and his reporting of illegal conduct. It also was timed to deprive him of unvested shares on the cusp of vesting—shares representing the multimillion-dollar equity payout Morley had promised. When Boynton questioned the decision, Morley's response was telling: the shares, he said, "were an incentive," a departure from the text he had sent just two years earlier stating that Boynton had "earned" them.

8.    Lightpath used Boynton's decades of expertise to rebuild itself, made promises it never intended to keep, and discarded him once his age no longer aligned with Morley's discriminatory vision for the company.

## NATURE OF THE CLAIMS

9.    This case arises from Lightpath's deliberate campaign of age discrimination, retaliation, and fraudulent misrepresentations. Lightpath targeted Boynton because of his age, stripped him of his position so that younger employees could advance, retaliated against him for reporting a hostile work environment marked by inappropriate, sexually charged, and ageist conduct and comments, and ultimately, terminated him just before promised equity vested, despite his strong performance and contributions to the business.

10.    Lightpath's conduct violated the New York State Human Rights Law and New York common law. Specifically, Lightpath's violations included:

a. Discriminating against Boynton on the basis of age, including by subjecting him to inferior terms and conditions of employment and terminating his employment, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.* ("NYSHRL");

b. Retaliating against Boynton for opposing and reporting unlawful conduct in the workplace, in violation of the NYSHRL; and

c. Fraudulently inducing Boynton to accept a diminished role through promises of equity and continued employment that were not intended to be honored, in violation of New York common law.

11. As a result of this unlawful conduct, Boynton has suffered significant economic losses, reputational harm, and severe emotional distress, and seeks full legal and equitable relief.

## JURISDICTION & VENUE

12. This action was originally commenced in the Supreme Court of the State of New York, County of Nassau, and was removed to this Court by Lightpath pursuant to 28 U.S.C. § 1441. *See* ECF No. 1.

13. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

14. Boynton is an individual citizen of and domiciled in the State of Florida.

15. Lightpath is a limited liability company whose members hold citizenship and principal places of business in Delaware and New York.[1] None of Lightpath's members hold citizenship or principal places of business in Florida.

---

[1] *See* Rule 7.1 Disclosure Statement of Cablevision Lightpath, LLC (Apr. 27, 2026) (ECF No. 12).

4

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1441(a) because this District embraces the place where the state court action was pending at the time of removal. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims herein occurred within the Eastern District of New York.

**PARTIES**

*Plaintiff Herbert Boynton*

17.     Plaintiff Herbert Boynton is a telecommunications executive with more than forty years of experience in the fiber-optic infrastructure industry. Over the course of his career, he has held senior leadership positions at multiple private telecommunications companies, including roles focused on strategic sales, acquisitions, operational turnarounds, and business growth.

18.     Before joining Lightpath, Boynton was part of the core leadership teams that built and sold three successive telecommunications companies: Conversent Communications, Lightower Fiber Networks, and a successor Lightower entity later acquired by Crown Castle, Inc. He played a significant role in those transactions, the largest of which exceeded $7 billion, and in developing key carrier relationships, including negotiating major wireless agreements with AT&T, Verizon, and Sprint.

19.     Following Lightower's sale to Crown Castle, Boynton remained in a senior role overseeing Carrier/Wholesale, Sales Engineering, and Data Center operations. He left that stable and lucrative position to join Lightpath based on Morley's personal recruitment and representations regarding Boynton's long-term role, equity participation, and future at the company.

20.     In April 2021, Boynton joined Lightpath as Senior Vice President and General Manager of Boston and a member of the Executive Management Team. He later served in senior

leadership roles including Senior Vice President ("SVP") of Operations, Executive Vice President ("EVP") of Operations, and EVP of Sales and Sales Engineering, and was involved in employee compensation and equity decisions at the highest levels of the company.

21.    As Executive Vice President of Sales, Boynton had six direct reports including Jerry Keefer (Vice President of Carrier Sales and Wholesale), Dave Argento (Vice President of Real Estate and Business Development), Thomas Gambino (Vice President of Sales Engineering), Michael Nicolosi (Senior Vice President of Client Services and General Manager of Miami Market), Danielle Joyce (Senior Director of Sales Operations), and Aaron Harrington (Sales Engineer and candidate for the Rotational Leadership Program).

22.    Although based in Florida, Boynton's role required regular and substantial presence in New York, including New York City. During significant periods of his employment, he traveled to New York approximately six to seven days per month.

23.    Lightpath's headquarters is in Bethpage, New York, and the company maintains an office in New York City. Boynton had consistent work responsibilities at those locations throughout his tenure.

24.    Several of Boynton's direct reports were based in New York, among them Mike Nicolosi and Tom Gambino. Boynton traveled to New York on a consistent basis to work with and oversee their teams.

25.    Lightpath operates out of the two largest data centers in New York City. Boynton's role in real estate gave him oversight of Lightpath's presence in those centers.

26.    Boynton also drove Lightpath's expansion into the New York City market. Prior to his arrival, Lightpath had no significant sales presence or physical cabling infrastructure in New York City. Boynton identified the opportunity for growth and led the effort to build out Lightpath's

6

footprint there, including expanding sales operations and deploying significant physical cabling and network assets throughout the city. Boynton frequently traveled to New York to oversee the expansion.

27.     As a member of the Executive Management Team, Boynton regularly traveled to New York City to attend board meetings, meet with company leadership and institutional investors, and participate in management meetings.

28.     Board meetings were primarily held at Morgan Stanley's offices in midtown Manhattan, where Boynton participated until close to the end of his tenure. Management meetings often took place at Lightpath's New York City office.

29.     Boynton also attended investor meetings in the New York City office and met with Altice's leadership at its corporate offices in Long Island City.

30.     Boynton reported to Chief Revenue Officer Doug Turtz, who was based in New York City, and regularly worked with him there.

31.     Key employment decisions affecting Boynton, including decisions regarding his compensation, responsibilities, equity, and termination, were made and communicated in connection with his work in New York.

32.     The discriminatory and retaliatory conduct giving rise to his claims had a direct impact in New York.

33.     At the time of his termination, Boynton was sixty-five years old.

34.     At all relevant times, Boynton was an "employee" within the meaning of all applicable statutes.

*Defendant Cablevision Lightpath LLC*

35.     Defendant Cablevision Lightpath LLC is a fiber-optic infrastructure and telecommunications services company that owns, operates, and manages a network of approximately 12,100 route miles of fiber-optic cable, serving more than 17,500 locations.[2] Lightpath provides network services to financial institutions, enterprise businesses, wireless providers, educational institutions, government entities, and media companies, including connections to data centers, cable landing stations, and major cloud providers.

36.     Lightpath was formerly part of Cablevision, which was sold to Altice USA. In December 2020, Altice USA spun Lightpath into a private company, selling a 49.9% stake to Morgan Stanley Infrastructure Partners for $1.8 billion. The company generates annual revenue exceeding $400 million and employs more than 500 people.

37.     Lightpath maintains its headquarters in Bethpage, New York, with operations across the New York metropolitan area, Boston, Miami, Phoenix, Ashburn, and parts of Ohio and Pennsylvania. Its executive management team is primarily based in Golden, Colorado.

38.     At all relevant times, Lightpath was an "employer" within the meaning of all applicable statutes.

**FACTS**

*Recruitment and Early Success*

39.     Boynton did not seek out Lightpath; he was recruited by CEO Chris Morley, who was familiar with his reputation and track record in the industry.

---

[2] *See* Lightpath "About Us," available at https://lightpathfiber.com/sites/default/files/2026-04/about-lightpath-04-17-26.pdf (last visited May 4, 2026).

40.     In the fall of 2020, Morley approached Boynton and his longtime colleague Doug Dalissandro inviting them to join Lightpath as part of a senior leadership team Morley was assembling to rebuild the company. Morley told Boynton that he (Boynton) was one of the smartest people in the business and the kind of executive he needed to help build Lightpath. He promised Boynton a "seat at the table," a meaningful role in shaping the company's future, and the opportunity for significant financial upside. Relying on those representations, Boynton left a lucrative position at Crown Castle to join Lightpath in April 2021.

41.     Boynton joined as Senior Vice President and General Manager of Boston and a member of the Executive Management Team. His initial responsibilities included integrating two Boston-based acquisitions—CNS and HUB Fiber—and overseeing Lightpath's Real Estate Group, which managed building access agreements and real estate holdings across the company's footprint. The Real Estate Group was in disarray when Boynton arrived. Lightpath was in default or delinquent on numerous contracts, hundreds of building agreements were missing, and morale on the team was poor. Boynton replaced the Director, brought in a trusted colleague, and improved the operation.

42.     In early 2022, Lightpath faced a more serious crisis. The company's net installations were declining, EBITDA was not growing, and the operations, construction, and network management functions were in need of restructuring. When the executive responsible for those functions stepped down, Morley and the leadership team turned to Boynton. He accepted the challenge, taking on the role of SVP of Operations, Construction, and the Network Management Center in April 2022. At the same time, he continued oversight of Sales Engineering, Real Estate, and Customer Service.

9

43.    The results were significant. Over the following eighteen months, Boynton restructured teams, improved processes, hired key personnel, and drove a turnaround in installation performance. Part of Boynton's success came from overseeing expansion of the company's geographic footprint in New York City. When he joined the company, Lightpath had virtually no presence there despite operating throughout the surrounding metropolitan area. Boynton spearheaded the effort to change that, building out fiber assets in Manhattan, securing access to buildings throughout the city, and establishing the infrastructure necessary to compete for New York City's commercial customers. The expansion into New York City was a significant strategic development for the company and opened a new revenue stream.

44.    Beginning in the second quarter of 2022, the company reversed its negative net installation trend and sustained that improvement. EBITDA grew, morale improved, and the organization Boynton built became the largest in the company.

45.    Boynton also delivered a significant commercial win during this period. In the summer of 2022, DISH Network was under a regulatory mandate to deploy a certain number of networks or face penalties. DISH selected Lightpath as one of its providers. The installations were moving slowly and the pressure was intense. Under Boynton's leadership, Lightpath succeeded in turning things around, ultimately outperforming almost every carrier on the DISH deployment and emerging as one of DISH's top providers nationally.

46.    Morley and the leadership team praised Boynton's performance. His A-2 shares were converted to A-1 Preferred shares, and he received additional equity in recognition of his contributions. He was promoted from Senior Vice President to Executive Vice President in early 2023. Boynton more than delivered the results Morley had asked of him.

***Morley's Pivot to AI and the Decision to "Go Young"***

47.     For the first two years of Boynton's tenure, Lightpath focused on stabilizing its core business, growing its client base, and improving performance. Beginning in or about 2022, Morley began pushing a shift to expand Lightpath beyond its traditional fiber network business into AI infrastructure and data center development, including through capital investments and partnerships with hyperscalers such as Amazon. This represented a departure from the company's existing business model and influenced decisions about the company's direction and leadership.

48.     Morley discriminatorily decided that the transformation he envisioned required a different workforce—one he described as younger.

49.     At a staff meeting in or around late 2022, attended by members of the Executive Management Team, Morley presented an age-based analysis of the company's workforce and stated that Lightpath had too high a percentage of employees over fifty. He stated that the company needed to change the composition of its workforce and "go young." He further stated that a young data analyst who knew nothing about the business was more valuable than an older sales or customer service employee. Morley also directed that raises should not be given to longer-tenured employees, whom he viewed as overcompensated.

50.     Morley repeated similar statements on other occasions. He told members of the Executive Management Team that the company needed to "get rid of the old people and bring in young staff." He referred to experienced telecommunications professionals in dismissive terms and made clear that, in his view, age and tenure were not aligned with the company's future direction. These statements and directives contributed to a workplace environment in which older employees were viewed as less valuable.

51.    The impact of Morley's directives was reflected in changes to the company's leadership. Beginning in 2023 and continuing into 2024, experienced telecommunications executives who had helped rebuild Lightpath's core business were increasingly marginalized. By early 2024, multiple senior executives over the age of fifty had separated from the company.

52.    Boynton watched this unfold. He had played a major role in moving the company from losses to profits and earned Morley's praise. But he was sixty years old when he joined Lightpath and would turn sixty-five before it was over. In Morley's new Lightpath, that made him a problem to be managed, not an asset to be rewarded.

***The 2023 Step-Down: Inducement, Promises, and the Beginning of Boynton's Removal***

53.    By August 2023, Boynton had spent eighteen months rebuilding Lightpath's largest organization, delivering measurable results, and earning accolades from Morley and the leadership team. He had done everything asked of him and more. That made what happened next all the more deliberate.

54.    In August 2023, Morley convened an executive offsite meeting in Delray Beach, Florida. In a session held at a colleague's home, Morley raised the subject of organizational changes. Morley wanted Boynton to step aside from his role as EVP of Operations. Morley framed it publicly as Boynton's choice—telling those present that Boynton could stay in his current role if he wished.

55.    Behind the scenes, Morley had already committed to Tim Haverkate—a younger executive in his thirties whom Morley had Boynton mentor—that Haverkate would move out of Service Delivery and into a new role overseeing product, marketing, and Lightpath's AI initiatives. Morley had also made a commitment that Massimo Cardarelli, then forty-seven years old, would

assume operational responsibilities. Morley described Haverkate and Cardarelli as "young and rising leaders" who needed room to advance.

56.     Morley had already made those commitments. Boynton was not being offered a choice. He was being pushed to vacate his position so that younger executives could move up. Morley had telegraphed as much when he declared the company needed to shed its older workforce and bring in young talent.

57.     With Operations stabilized, Morley directed Boynton to turn his attention to sales, which was in need of leadership. Boynton accepted the new charge and committed to delivering results there as he had in every prior role.

58.     To secure Boynton's cooperation, and to keep an excellent performer working a little longer, Morley made a series of deliberate promises. He told Boynton there would always be a position for him at Lightpath. Morley promised Boynton that he would remain a member of the Executive Management Team with a seat at the table, including at board meetings. More concretely, Morley promised Boynton additional equity.

59.     On November 15, 2023, Morley awarded Boynton an additional 9,750 A-1 Preferred shares, bringing his total to 35,750. Morley sent Boynton a text showing the value of his equity at various return multiples, ranging from $6.4 million at a 2.1x return to $24 million at a 4.0x return. Morley's message was unambiguous: "Congrats as you earned it. Now need to create the upside scenarios."

60.     Boynton relied on those promises. He stepped aside from the role he had built, transitioned back into sales, and committed himself to delivering results in his new position. He had every reason to believe Morley meant what he said. He had no reason to suspect that the

promises were hollow inducements designed to secure his cooperation, allowing Morley to continue benefiting from his hard work and experience while moving him toward the exit.

61.     The first sign that Morley's promises would not be honored came shortly after the organizational changes. In announcing the restructuring, Morley identified new leadership roles for other executives but did not clarify Boynton's future role.

62.     Boynton continued to run sales through the first quarter of 2024, delivering strong results and performing functions associated with the Chief Revenue Officer ("CRO") role. In early April 2024, Morley informed Boynton that Doug Turtz would be returning to the company as CRO, and that Boynton would report to him.

63.     The appointment of Turtz was inconsistent with Morley's prior representations to Boynton regarding his future role in sales leadership. Rather than formalizing Boynton's position, Morley installed another executive in the CRO role and placed Boynton in a subordinate position, despite his continued excellent performance and experience.

64.     Compensation cuts followed. In April 2024, Boynton discovered that his quarterly compensation had been reduced by $50,000 from what Morley had promised. Boynton twice asked Morley for an explanation but never got one.

65.     In early 2025, Morley reduced Boynton's base salary by an additional $25,000, restructuring his compensation in a way that left him worse off, despite his continued strong performance. Again, no explanation was given.

66.     In October 2024, Morley visited Boston for a series of customer meetings. That evening, Morley, Boynton, and Doug Dalissandro had dinner together at a restaurant in Lynnfield, Massachusetts. During dinner, Morley turned to Boynton and asked what his plans were and whether he was thinking about retiring. The question was unprompted and unmistakable in its

14

implication. Boynton responded that his plan was to remain with the company "to the end" and that he had significant equity still to vest. Morley replied that if his plans changed, Boynton should let him know and he would work with him on a good exit.

67. The exchange was disconcerting. Morley had just asked a sixty-four-year-old executive, who was actively managing five departments and delivering results, whether he was planning to retire. It was not a casual question. It was a signal.

68. Throughout this period, Boynton continued to deliver, even as his role was diminished and the promises made to him were not fulfilled. His team met or exceeded its sales targets in 2023, 2024, and into 2025.

69. The Carrier and Wholesale business Boynton oversaw performed at or above plan. He managed five departments, handled executive escalations across the organization, and contributed to some of the company's most significant commercial achievements, including a major T-Mobile deal that closed in the third quarter of 2025 and generated substantial revenue for the company.

70. But by that point, Morley's intentions were becoming clearer. During the T-Mobile negotiations, Morley asked the Account Executive, Jeff Mollica, and Vice President of Carrier Sales and Wholesale, Jerry Keefer, to remove Boynton from the deal's calls.

71. None of Boynton's success was enough to overcome the liability Morley had decided Boynton represented: a sixty-five-year-old executive in a company that had decided it wanted to look younger.

***Harding Arrives—A Hostile Environment Takes Hold***

72. In January 2025, Morley announced a reorganization that divided Lightpath into two divisions and hired Joseph Harding, who is ten years younger than Boynton, as President to

lead one of them. Harding had no prior experience in the fiber infrastructure industry and limited operational background, having spent most of his career in marketing roles. His appointment aligned with Morley's stated preference for a younger leadership group.

73.    Morley called Boynton personally when the hire was announced. When Boynton asked what the change meant for him, Morley assured him that nothing would change other than having a new boss. That assurance, like so many before it, proved false.

74.    With Harding installed, the age-based conduct continued. In February 2025, Boynton attended a board meeting in Miami, one of the last he would attend before being removed from the invite list. Boynton had just turned sixty-five. Prior to the meeting, Morley repeatedly asked permission to announce Boynton's sixty-fifth birthday to the board. Boynton declined each time. It was a telling moment. That Morley felt compelled to make an issue of Boynton's age before the company's board, while simultaneously sidelining him, said everything about the lens through which Morley viewed Boynton.

75.    Boynton first met Harding at the company's sales kickoff in mid-January 2025. The encounter was immediately uncomfortable. Harding asked Boynton whether he was married. When Boynton replied that he was engaged, Harding asked where his fiancée was from. Upon learning she was Italian, Harding became animated, telling Boynton he loved Italian women. Harding then insisted on seeing a photograph of her, commented on her appearance and how Italian women dress, and asked whether she would be attending the company's President's Club trip to Aruba. It was Boynton's first substantive conversation with the new President of the company.

76.    It was not an isolated incident. Over the following months, Harding's conduct established a pattern of inappropriate sexual comments and behavior that permeated the workplace.

77.     At the company's President's Club trip in Aruba, Harding told a female colleague who served as head of company events about conduct at his prior employer—specifically, that they would pay "beer cart girls" to remove their tops during golf outings, and that one of those women had been impregnated by someone at the company.

78.     At a business meeting in Boston attended by Boynton and other senior managers, including the newly appointed Director of Boston Sales, a colleague referenced a medical outreach initiative the company had been developing under the name "Doc in the Box." Harding responded by saying out loud, "that's like a dick in a box." The sexualized comment visibly embarrassed everyone in the room.

79.     On another occasion, Harding made an inappropriate sexual comment to a colleague who had recently undergone hip surgery, telling him to be careful having sex. Harding's conduct was frequent, obvious, recurring, and unchecked.

80.     Boynton did not participate in or condone Harding's conduct. He reported Harding's behavior to his supervisor, Doug Turtz, on multiple occasions. Boynton described specific incidents to Turtz and expressed concern that Harding was creating a hostile work environment and exposing the company to significant liability. Turtz acknowledged the concerns and represented that he would raise them with Morley and human resources.

81.     No investigation was conducted. No corrective action was taken. Harding faced no consequences.

82.     Instead of addressing the problem, Lightpath allowed the hostile environment to persist.

83.     After Boynton complained about Harding's conduct, Harding, who had never had a single one-on-one meeting with Boynton despite Boynton's senior role, began actively working

to undermine him. Harding approached Turtz and other senior managers, asking what Boynton did and suggesting he was not contributing value. He commissioned a pretextual interview of Boynton by a newly hired colleague to document his role and responsibilities. At a dinner during the company's August 2025 sales meeting in Newport, Rhode Island, attended by multiple senior managers, Harding stated that he intended to start "managing people out of the business." Everyone in the room understood what that meant. Two weeks later, Boynton was terminated.

*The Termination*

84.    By the summer of 2025, Boynton had been removed from executive management meetings, excluded from board meetings, and increasingly sidelined despite continuing to manage five departments and deliver results.

85.    On August 21, 2025, Boynton received a Teams call from Morley asking if he was free. Boynton spoke with Morley from his car. Morley told him he considered him a friend and loved him. He acknowledged that Boynton had done a great job, had done nothing wrong, had performed at the highest level, and had done everything asked of him. He then told Boynton that he was being terminated.

86.    The stated reason—that Boynton was not providing value equivalent to his compensation—was directly contradicted by everything Morley had just said. Morley claimed that he had looked across the company for another role where Boynton could contribute and could not find one.

87.    The explanation was pretextual on its face. Boynton was managing five departments, overseeing the Carrier and Wholesale business that was performing above plan, handling executive escalations, and contributing to major commercial transactions. The notion that no role existed for him was not a business conclusion. It was a predetermined outcome.

18

88.    When Boynton pushed back on the termination of his unvested equity, Morley's response was revealing. The shares, he said, "were an incentive," a direct contradiction of the text he had sent Boynton just two years earlier, when he awarded the shares and wrote "Congrats as you earned it."

89.    The pretextual nature of the termination was confirmed in the days that followed. Boynton's direct supervisor, Doug Turtz, contacted him and told him the situation was wrong and unfair. Turtz confirmed that company leadership had been pushing to remove Boynton. The real reason, Turtz said, had nothing to do with value: Lightpath wanted Boynton's compensation freed up to hire younger digital marketers and product managers. Turtz also told Boynton that he had proposed to Morley that Boynton take on additional responsibilities, including oversight of organizations he had previously run successfully. Morley rejected the proposal. The decision had been made. Boynton was out.

90.    The consequences for Boynton were severe and lasting. He was sixty-five years old at the time of his termination, with a career built over four decades in an industry where relationships and reputation are everything. The unvested shares, which were forfeited as a result of his termination, represented a potential payout of millions of dollars in a company sale Morley himself had said was coming within eighteen to twenty-four months. A significant tranche of equity was set to vest in less than three months after his termination. The T-Mobile deal Boynton had helped advance closed in the third quarter of 2025, generating a substantial bonus payment due in October 2025 that Morley's separation offer did not fully account for. Boynton was terminated before he could benefit from the very results he had produced.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF AGE**
**IN VIOLATION OF THE NYSHRL**

91.    Plaintiff incorporates by reference all preceding allegations.

92.    Plaintiff was qualified for and performing well in his position with Defendant.

93.    Defendant terminated Plaintiff's employment when he was sixty-five years old.

94.    Defendant intentionally discriminated against Plaintiff because of his age, treating him less well than other employees because of his age.

95.    Defendant subjected Plaintiff to inferior terms, conditions, or privileges of his employment because of his age, including but not limited to: compelling him to step aside from his senior leadership role to make way for younger employees; reducing his compensation on multiple occasions without explanation; excluding him from board meetings and executive management meetings; and terminating his employment.

96.    At all relevant times, Morley was Defendant's Chief Executive Officer and a high-level managerial employee sufficiently elevated in Defendant's organization to be viewed as its proxy, such that his discriminatory conduct is imputed to Defendant under the NYSHRL.

97.    Defendant took adverse employment actions against Plaintiff because of his age.

98.    Defendant knew or should have known that its actions constituted unlawful discrimination or otherwise showed reckless disregard for Plaintiff's statutorily protected rights under the NYSHRL.

99.    As a result of Defendant's discrimination, Plaintiff suffered severe damages, including lost income and benefits, lost opportunity for advancement, and emotional distress.

20

## SECOND CAUSE OF ACTION
## RETALIATION
## IN VIOLATION OF THE NYSHRL

100.    Plaintiff incorporates by reference all preceding allegations.

101.    By the actions described above, among others, Defendant retaliated against Plaintiff in violation of the NYSHRL because Plaintiff engaged in protected activity, including opposing and reporting discrimination, harassment, and a hostile work environment.

102.    Defendant was aware that Plaintiff engaged in protected activity.

103.    Defendant took adverse employment actions against Plaintiff, including, but not limited to, terminating his employment.

104.    The adverse employment action was causally connected to Plaintiff's protected activity.

105.    Defendant knew that its conduct constituted unlawful retaliation and/or showed reckless disregard for Plaintiff's statutorily protected rights.

106.    As a result of Defendant's unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer severe harm, including loss of wages, reputational injury, litigation costs, and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
## IN VIOLATION OF COMMON LAW

107.    Plaintiff incorporates by reference all preceding allegations.

108.    Defendant made material false representations to Plaintiff to induce him to step aside from his senior leadership role but remain a contributing employee, including that he would receive additional equity compensation; he would retain a seat at the table, continuing to participate in board meetings; and, he would always have a job at Lightpath.

109.    Defendant knew the material representations were false at the time they were made.

21

110.   Morley was acting within the scope of his employment as CEO at all relevant times, including when he made the material false representations and when he later participated in the decision not to honor those representations.

111.   Plaintiff reasonably relied on the representations.

112.   Defendant intended to defraud Plaintiff.

113.   As a direct and proximate result of Defendant's fraudulent representations, Plaintiff suffered significant damages, including lost compensation, the forfeiture of unvested equity representing a potential payout of millions of dollars, lost future earnings, and other economic harm in an amount to be determined at trial.

114.   Defendant's conduct was intentional, deliberate, and undertaken with reckless disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

### JURY DEMAND

115.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Herbert Boynton hereby demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

Wherefore, Plaintiff, Herbert Boynton, demands that a judgment be entered in his favor and the Court award the following relief against Defendant:

A.   Compensatory damages including back pay, front pay, lost wages, bonuses, and equity compensation, including but not limited to: the value of unvested A-1 Preferred shares forfeited as a result of Plaintiff's termination; compensation unlawfully reduced without explanation in 2024 and 2025; all other contractually promised and earned compensation, including bonus amounts due and unpaid at the time of termination; and emotional distress damages, together with punitive damages for Defendant's discriminatory conduct;

B.      Compensatory damages including back pay, front pay, lost wages, bonuses, and equity compensation, including but not limited to: the value of unvested A-1 Preferred shares forfeited as a result of Plaintiff's termination; compensation unlawfully reduced without explanation in 2024 and 2025; all other contractually promised and earned compensation, including bonus amounts due and unpaid at the time of termination; and emotional distress damages, together with punitive damages for Defendant's retaliatory conduct;

C.      Attorney's fees and costs; and

D.      Such other and further injunctive, equitable, and legal relief as this Court deems just and proper.

Dated: Melville, New York
       May 14, 2026

Respectfully submitted,

By: /s/ Troy L. Kessler
        Troy L. Kessler

**KESSLER MATURA P.C.**
Troy L. Kessler
Benjamin Goldstein
534 Broadhollow Road, Suite 275
Melville, New York 11747
(631) 499-9100
tkessler@kesslermatura.com
bgoldstein@kesslermatura.com

**SMITH MULLIN P.C.**
Nancy Erika Smith*
Jesse Sengstacke*
240 Claremont Avenue
Montclair, New Jersey 07042
(973) 783-7607
nsmith@smithmullin.com
jsengstacke@smithmullin.com
*Admitted Pro Hac Vice

***Attorneys for Plaintiff***

23